UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA          :

      - v. -                                  :      S5 11 Cr. 32 (JSR)

WALTER SHIMOON,                   :

      Defendant.                          :

------------------------------------x

## THE GOVERNMENT'S SUBMISSION
## PURSUANT TO SECTION 5K1.1 OF THE GUIDELINES

      PREET BHARARA
      United States Attorney for the
      Southern District of New York
      Attorney for the United States
            of America.

ANTONIA M. APPS
KATHERINE GOLDSTEIN
Assistant United States Attorneys

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

June 24, 2013

BY HAND

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

   Re: United States v. Walter Shimoon,
      S5 11 Cr. 32 (JSR)

Dear Judge Rakoff:

  The Government respectfully submits this letter to advise the Court of the pertinent facts concerning the assistance that Walter Shimoon ("Shimoon") has rendered in the investigation and prosecution of others. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled on July 1, 2013, the Government intends to move, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a) of the Guidelines.

**I. Background**

  A. Shimoon's Personal Background

  Shimoon is a 41-year old married father of three with a degree in electrical engineering from the University of Ottowa. For the first part of his career he worked as an engineer at various technology companies in Canada and then San Diego. In 2002, Shimoon began working at Flextronics International, Ltd., a technology company that designs, engineers and manufactures electronics products. In 2008, Shimoon moved to VistaPoint, a subsidiary of Flextronics, which manufactured cameras, displays and power supply products for consumer electronics.

  Shimoon was personally responsible for initiating and developing his subsidiary's business relationship with Apple, which ultimately became Flextronics's largest customer for cameras. He received the non-disclosure agreement for every new Apple product involving a camera, and signed many of them. In addition, in June 2010, he was part of the team responsible

for negotiating a new contract with Apple which contained a liquidated-damages clause for disclosure of non-public information.

In his position as Senior Director of Business Development of VistaPoint, Shimoon routinely had contact with his counterparts at customers such as Apple, Palm and Research in Motion ("RIMM"), as well as his component suppliers, including, most importantly, Omnivision, which produced the sensors that went into Flextronics' cameras for Apple products. He also had regular meetings with his counterparts in other business units who worked on accounts for Cisco, among other customers. From these relationships, Shimoon had access to material, nonpublic information ("Inside Information") about: (a) forecasts and actual production numbers of cameras and chargers for Flextronics and its customers, including Apple, Palm and RIMM; (b) information about pricing and unit sales for other component suppliers to Flextronics, including Omnivision; and (c) product development, including the release of new products and next-generation versions of existing products.

B. Shimoon's Criminal Conduct

Shimoon disclosed Inside Information regarding the business of Flextronics and Flextronics' customers (such as Apple, RIMM and Cisco) and suppliers (such as Omnivision) in breach of his fiduciary duties owed to Flextronics and nondisclosure agreements with Flextronics's business partners. He disclosed that information through two consulting arrangements: (1) with the expert networking firm Primary Global Research ("PGR"); and (2) with John Kinnucan, who ran his own investment research company called "Broadband Research." PGR connected public company insiders with money managers through a telephone conference system, receiving quarterly fees from its clients and paying consultants an hourly fee for their calls with PGR's clients. Kinnucan was an independent consultant who obtained information from company insiders, including Shimoon, and then passed that information to his investment firm clients for a fee.

*1. Shimoon' Consulting Relationship With Primary Global Research ("PGR")*

Between September 2008 and mid-2010, Shimoon was a consultant for PGR. As a PGR consultant, Shimoon provided Inside Information about Flextronics's customers and suppliers to PGR employees and clients, who were hedge funds and money managers. Shimoon knew that PGR's clients sought the information for purposes of executing securities transactions. PGR paid Shimoon approximately $24,725 for his consulting calls.

For example, in October 2009, Shimoon had a telephone conversation with a cooperating witness in which he disclosed that the next generation Apple "iPhone" would have two cameras, which would enable video-conferencing. Shimoon acknowledged that Apple was being "very secretive" about the product, and Shimoon then provided an expected launch date of the product. He also informed the cooperating witness that Apple was coming out with a new product (it turned out to be the Apple iPad), to which Apple assigned the internal "code name . . .[of] K48." Shimoon commented: "at Apple you can get fired for saying K48 . . . outside of a meeting that doesn't have K48 people in it. That's how crazy they are about it." Shimoon also told a hedge

The Honorable Jed S. Rakoff
June 24, 2013
Page 3

fund analyst about projected unit sales for the Apple Tablet that he had learned from Flextronics's business relationship with Apple.

Additionally, on or about October 15, 2009, Shimoon had a telephone conversation with an analyst at a hedge fund (identified as "Hedge Fund A" in the Information), during which Shimoon provided information indicating that demand in a certain segment of Flextronics's business was slowing into the next quarter. Subsequently, between on or about October 19, 2009 and October 21, 2009, Hedge Fund A sold short approximately 600,000 shares of Flextronics stock. Hedge Fund A later covered the position, earning illegal profits of approximately $560,000.

On or about November 23, 2009, Shimoon provided information to the same hedge fund analyst regarding production numbers for Omnivision, which he had learned through his business relationship with Omnivision (Omnivision supplied the sensors for the cameras that went into Apple's iPhone). Shimoon stated that Omnivision's revenues from sales relating to Apple products would significantly increase in the next fiscal year. At the time, Apple was Omnivision's largest and most significant customer. Hedge Fund A purchased over 512,000 shares of Omnivision between November 24 and December 16, 2009, and later liquidated that position, earning illegal profits of approximately $750,000.

   *2. Shimoon's Provision Of Inside Information To Kinnucan*

From late 2008 through 2010, Shimoon also provided Inside Information to John Kinnucan. Shimoon provided information regarding Apple, Cisco, and Omnivision, including the fact that Apple's new iPhone would have two cameras, that Apple was planning to launch a new Tablet ("K48"), as well as Omnivision's and Apple's sales forecasts. For example, on or about May 3, 2010, Shimoon learned from his source at Omnivision that Omnivision had sold approximately 400 million sensors last year, which barely met expectations, but that they were projected to sell 700 million next year. Shimoon shared this information with Kinnucan in advance of Omnivision's May 27, 2010 earnings announcement.

When Shimoon first met Kinnucan, he promised to pay Shimoon a retainer of $10,000 for providing information to Kinnucan. However, Shimoon was never paid that much. From December 2008 through September 2010, Shimoon received approximately $27,500 from Kinnucan, from a total of five checks for $5,000 each, and one "bonus" check for $2,500.

Although Shimoon acquired much of the information about Flextronics's customers and suppliers through his normal business activity, there were also occasions when he sought out information to answer analysts' or Kinnucan's specific questions and requests for information. For example, one PGR client asked Shimoon, on a March 2010 call recorded pursuant to a court-authorized wiretap, for a forecast of RIMM's "June qtr" revenue growth "before noon on Wednesday," which was the day that RIMM publicly announced its numbers. Shimoon then sent an email to other Flextronics employees to obtain the information about RIMM's next quarter growth.

Shimoon also traded in his personal account on the information he received from his source at Omnivison, earning approximately $1,700 from his trading activity.

C. Guilty Plea

On July 5, 2011, Shimoon pled guilty before Your Honor to a three-count Information pursuant to a cooperation agreement. Count One charged Shimoon with conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371, in connection with Shimoon's passing of Inside Information to clients and employees of PGR between mid-2008 and 2010. Count Two charged Shimoon with conspiracy to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371, in connection with Shimoon's passing of Inside Information to John Kinnucan between late 2008 and 2010. Count Three charged Shimoon with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, and Title 18, United States Code, Section Two, in connection with Shimoon's provision of Inside Information to Hedge Fund A between November and December 2009. The total maximum sentence of incarceration on all counts in the Information is 30 years' imprisonment.

At his plea allocution, Shimoon acknowledged his criminal conduct, stating, among other things:

> I spoke directly to [PGR] employees and held conference calls with [PGR's] clients. On these calls I provided specific material nonpublic information which I learned on my job at Flextronics. . . . At the same time, I also worked for a second research firm and provided the same type of information to that firm. . . . At the time I was employee as an expert consultant, I knew that the clients of these . . . expert firms were investment companies such as hedge funds and equity traders. I therefore knew that they were using the information I provided to make decisions on purchasing and selling securities. . . . Some of the information I provided as an expert consultant included specific production schedules and forecasts for Flextronics customers. . . . I knew that I was not authorized to use this information for my own personal gain and by doing so I breached my fiduciary duty to Flextronics.

The Honorable Jed S. Rakoff
June 24, 2013
Page 5

D. Guidelines Calculation

Shimoon's sentencing Guidelines range is calculated as follows:

1. Pursuant to U.S.S.G. § 2B1.4(b), which is the applicable guideline for insider trading, the base offense level is 8.[1]

2. Pursuant to U.S.S.G. § 2B1.1(b)(1), the base offense level is increased by the "gain resulting from the offense" from the table in § 2B1.1(b)(1). The applicable "gain" is "the total increase in value realized through trading in securities by the defendant and persons acting in concert with the defendant or to whom the defendant provided inside information . . . ." U.S.S.G. § 2B1.4 cmt. Accordingly, based on Hedge Fund A's securities transactions in Flextronics and OVT, which resulted in a combine profit of approximately $1,310,000 and were based in whole or in part on Shimoon's information, the base offense level is increased by 16 levels pursuant to § 2B1.1(b)(1)(I) (for gain between $1 million and $2.5 million.

3. Pursuant to U.S.S.G. § 3E1.1, because Shimoon timely accepted responsibility for his crimes, his offense level is decreased by 3 levels.

Shimoon's total offense level is 21. Because Shimoon has no criminal history, and is therefore in Criminal History Category I, his sentencing Guidelines Range is 37 to 46 months' imprisonment.

## II. Shimoon's Cooperation

Shimoon provided substantial assistance to the Government in connection with the Government's investigation and prosecution of John Kinnucan, as well as other ongoing insider trading investigations. Shimoon began cooperating shortly after he was arrested and has been candid and forthcoming about his own culpability. Shimoon's information has been truthful and complete, and he disclosed to the Government details of his own criminal activities, some of which the Government was unaware prior to meeting with Shimoon. Many of his statements have been corroborated by wiretap evidence, toll records, witnesses, and other documentary evidence.

Shimoon's cooperation led directly to the Government's ability to bring charges in *United States* v. *Kinnucan*, 12 Cr. 168 (DAB), for insider trading violations. Shimoon provided important information about the nature of the inside information he provided to Kinnucan, which was used in connection with the Government's charges against Kinnucan. Additionally, Shimoon informed the Government about various steps taken by Kinnucan to conceal his illegal

---

[1] Counts One, Two and Three are grouped pursuant to U.S.S.G. § 3D1.2(b) because they involved the same set of victims and two or more acts or transactions constituting part of a common scheme or plan.

The Honorable Jed S. Rakoff
June 24, 2013
Page 6

activity. For example, Kinnucan warned Shimoon not to put information in email, and Kinnucan took pains to avoid talking about money or checks on the telephone with Shimoon, instead using the word "autograph." Kinnucan also told Shimoon not to "ruffle any feathers" by digging around for information that was not readily accessible to Shimoon. Shimoon was one of two cooperating witnesses the Government expected to call at Kinnucan's trial, and he was the most important cooperating witness against Kinnucan. That Shimoon stood ready and willing to testify against Kinnucan undoubtedly contributed to Kinnucan's decision to plead guilty. Kinnucan was sentenced to 51 months' imprisonment by Judge Batts.

Like all defendants, Shimoon has incurred significant financial and reputational harm as a result of his cooperation. Unlike most white collar defendants, however, Shimoon's cooperation has also exposed him to the risk of retaliation and violence. After Shimoon pled guilty, during which allocution he acknowledged his criminal conduct with Kinnucan, Kinnucan left Shimoon threatening voicemails at his home and sent emails that threatened both Shimoon and his family. In fact, Kinnucan pled guilty to obstruction of justice based on the threats he made to a number of individuals (including prosecutors). Despite these threats, Shimoon continued to remain committed to his cooperation, without complaint or hesitation.

Shimoon has also provided assistance in the Government's investigations of other hedge fund professionals who received inside information through PGR. In that regard, Shimoon provided the Government with corroborating emails and other documents supporting his tipping of inside information to others. To date, these individuals have not been charged, but for reasons entirely unrelated to Shimoon's efforts and assistance.

The Honorable Jed S. Rakoff
June 24, 2013
Page 7

### III.     Conclusion

As described above, Shimoon's cooperation was critical to the investigation and prosecution of John Kinnucan. Without his assistance, it is unlikely the Government would have been able to bring charges against Kinnucan. Shimoon also provided useful information about other hedge fund professionals engaged in insider trading. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to request at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1 of the Guidelines.

Respectfully submitted,

PREET BHARARA
United States Attorney

By: _____
Antonia M. Apps
Katherine Goldstein
Assistant United States Attorneys
(212) 637-2198/2262

cc:     Henry Mazurek, Esq. (By e-mail)